UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
ALIX FORMILIEN,

                    Plaintiff,          10 Civ. 3077 (NRB)

          - against -                   **MEMORANDUM AND ORDER**

BEAU DIETL & ASSOCIATES, INC.

                    Defendant.
--------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


### I. Introduction

     Plaintiff Alix Formilien ("Formilien") brings this action
against his former employer, Beau Dietl & Associates, Inc.
("Beau Dietl"),[1] asserting claims for discrimination on the basis
of both his race and national origin as well as a hostile work
environment and retaliation under Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e et seq., as amended ("Title
VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, as
amended ("§ 1981"), and also state and municipal laws.
Defendant Beau Dietl moves for summary judgment on all of these
claims, arguing that it had legitimate and nondiscriminatory as
well as non-retaliatory reasons for all of its employment

---

[1] Though named in the complaint as "Beau Dietl & Associates, Inc.," Beau Dietl
stated in its answer that it "is not a corporation."  Answer ¶ 4.  Regardless
of whether Beau Dietl is a corporation or an unincorporated business entity
of one stripe or another, Formilien fails to sufficiently allege diversity
jurisdiction, as discussed below in Part III.E.

decisions as to Formilien, who served as a security officer, including its decision to terminate him.  For the reasons stated above, Beau Dietl's motion for summary judgment is granted as to the federal law claims, and we exercise our discretion to dismiss the remaining state and municipal law claims.

## II. Background[2]

### A. Beau Dietl, Formilien, and the Role of Security Officers

Beau Dietl, which maintains its principal place of business in New York, New York, provides security officers on both a temporary and permanent basis to serve at the sites of its

---

[2] The facts recited here are drawn from the following sources: (1) Defendant's Statement of Material Facts on Motion for Summary Judgment ("Def.'s R. 56.1"); (2) the Affidavit of Leibin DeJesus in Support of Defendant's Motion for Summary Judgment and the exhibits thereto ("First DeJesus Aff."); (3) Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl.'s R. 56.1"); (4) the Affidavit of Alix Formilien in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment and the exhibits thereto ("Formilien Aff."); and (5) the Reply Affidavit of Leibin DeJesus in Support of Defendant's Motion for Summary Judgment and the exhibit thereto ("Second DeJesus Aff.").  We note that Formilien, who is represented by counsel, has failed to comply with Local Rule 56.1(b), which requires that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party."  Local Rule 56.1(b).  Formilien completely disregards this requirement, including eleven numbered paragraphs in his opposing statement of material facts that do not in any way correspond to the nineteen numbered paragraphs in Beau Dietl's moving statement of material facts.  Compare Def.'s R. 56.1 with Pl.'s R. 56.1.  On this basis alone, we would be entitled to treat as undisputed all of the allegations in Beau Dietl's moving statement of material facts.  See Local Rule 56.1(c).  However, we further note that both parties have largely failed to cite to admissible evidence following each statement in their submissions in violation of Local Rule 56.1(d), and their plain oversight of this obligation leaves us "free to disregard the assertion[s]" that we find are lacking in support.  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted).  Thus, in light of the failure of both parties to abide by these rules whose purpose "is to streamline the consideration of summary judgment motions," we exercise our "broad discretion . . . to overlook [their respective] failure[s]" and "opt to conduct an assiduous review of the record" where we find that the moving and opposing statements of material facts are in conflict.  Id. at 73, 74.

clients.    First DeJesus Aff. ¶ 2; Formilien Aff. Ex. 4 ¶ 2.
Describing the position of a security officer, the Security
Officer Handbook (the "Handbook"), which contains "policies,
procedures, and regulations . . . prepared for the guidance of
all employees" of Beau Dietl, states that "the primary function
of a security officer is to protect life and property."  Id. at
Ex. I ("Handbook") 3, 8 (describing the general duties of a
security officer and listing inter alia "[t]aking charge of and
enforcing access control . . . systems" and "making certain no
unauthorized removal of property takes place").   By its own
terms, the Handbook, which was provided to Formilien, "is a tool
to assist [security officers] in performing [their] assigned
duties" that is intended "to inform [them] of [c]ompany
[p]olicy" and that should be carried "on [their] person whenever
[they] are on duty."  Id. at ¶ 13, Handbook 25.

    Beau Dietl hired Formilien to work as a security officer on
or about April 15, 2006, the date on which he was first assigned
to a client site.[3]  Id. at Ex. D 1.  Formilien is a black male
whose country of origin is Haiti and who resides in Brooklyn,
New York.  Pl.'s R. 56.1 Ex. 3 ¶ 1.  Between April 15, 2006 and
February 26, 2007, the date of his termination from Beau Dietl,
Formilien was assigned to a client site on almost 200 days and

---

[3] Formilien states that Beau Dietl employed him beginning on April 4, 2006.
Pl.'s R. 56.1 ¶ 2.  Beau Dietl represents that he was employed "from on or
about April 15, 2006."  Def.'s R. 56.1 ¶ 1.  The precise date is immaterial.

3

worked for over 1,800 hours.   First DeJesus Aff. Ex. D 1-5
(reflecting payroll information for the entirety of Formilien's
term of employment).[4]   In particular, Formilien worked for Conde
Nast Publications at five sites in Manhattan for 111 days
between April 15, 2006 and January 16, 2007; Estee Lauder
Companies, Inc. at four sites in Manhattan for fourteen days
between August 31, 2006 and November 15, 2006; The Morgan
Library at one site in Manhattan for forty-one days between
September 12, 2006 and January 25, 2007; and Bombardier
Transportation ("Bombardier") at one site in Queens for thirty-
one days between October 25, 2006 and February 21, 2007.   Id.[5]

According to Leibin DeJesus ("DeJesus"), who at all
relevant times served as an Operations Assistant Manager at Beau
Dietl, security officers do not receive permanent assignments
insofar as their allocation to client sites is determined on an
as-needed basis by clients.   Id. at ¶ 9.   As DeJesus further
explains, Formilien, like many of the security officers employed
by Beau Dietl, was often transferred and temporarily assigned
from one client site to another client site in order to cover
for the planned or unexpected absences of his colleagues.   See

---

[4] On a number of occasions, Formilien worked at two different client sites on
a single day.   See, e.g., First DeJesus Aff. Ex. D 1, 3 (multiple client
sites on May 28, 2006, October 25, 2006, and October 30, 2006).
[5] In addition to these four clients at whose sites he worked for multiple
days, Formilien also worked for two other clients at sites in Manhattan for
one day in each case.   See First DeJesus Aff. Ex. D 3 (October 17, 2006 and
October 20, 2006).

Def.'s R. 56.1 ¶ 2; First DeJesus Aff. ¶ 2, Ex. D.  By way of example, in the second quarter of 2006, payroll records reflect that forty-six security officers were transferred four or more times between client sites by Beau Dietl.  <u>See</u> First DeJesus Aff. Ex. A (listing security officers).  Of the thirty-seven of these forty-six security officers whose race is identified, thirty were black and seven were Hispanic.  <u>Id.</u>  Of the twenty-three of these thirty black security officers whose national origin is identified, twelve were from the United States, eight were from Haiti, and three were from Jamaica.  <u>Id.</u>  Of the four of these seven Hispanic security officers whose national origin is identified, one was from Puerto Rico, one was from Panama, one was from Ecuador, and one was from Guatemala.  <u>Id.</u>  During this same period, we note that Formilien exclusively worked for Conde Nast Publications and almost entirely at a single one of its client sites in Manhattan where he was assigned for forty-two days.  <u>See</u> <u>id.</u> at Ex. D 1-2.

### B. Formilien's Assignment to JFK

On October 25, 2006, Formilien voluntarily attended a special training session that was conducted by Bombardier at its client site at the John F. Kennedy International Airport ("JFK") in Queens, which Bombardier required all security officers from Beau Dietl to complete before being assigned there due to certain safety issues.  Def.'s R. 56.1 ¶¶ 4-5; First DeJesus

Aff. ¶¶ 5, 9; Second DeJesus Aff. Ex. A 1.  It is not disputed
that Formilien understood that as a result of his participation
in this special training session that he would be assigned
whenever necessary to JFK.  Def.'s R. 56.1 ¶ 5.  In late
December 2006, Beau Dietl assigned Formilien to JFK on six days
between Saturday, December 30, 2006 and Sunday, January 7, 2007
to cover for another security officer, Jean Faneau ("Faneau"),
who was on vacation.  Id. at ¶ 6; First DeJesus Aff. ¶ 6, Ex. D
4, Ex. E 1.[6]  In the middle of January 2007, Beau Dietl once more
assigned Formilien to JFK on three days between Friday,
January 19, 2007 and Sunday, January 21, 2007 to again cover for
another security officer, Leslie Whylly ("Whylly"), who was on
vacation.  First DeJesus Aff. Ex. D 5, Ex. E 1.

Earlier, on January 16, 2007, Beau Dietl had terminated
another security officer, David Merius ("Merius"), who was among
the few employees who had received the special training session
that Bombardier required of security officers serving at JFK.
Id. at ¶¶ 7, 10-11, Ex. B 10; Second DeJesus Aff. Ex. A 3.
According to DeJesus, as a result of this development, after
Formilien worked a few more days at JFK following Whylly's
return from vacation, he was assigned to the client site on a
more regular basis to replace Merius.  Def.'s R. 56.1 ¶ 9; First

---

[6] Prior to December 30, 2006, Formilien had only been assigned to JFK once on
November 20, 2006.  See First DeJesus Aff. Ex. D 4.

DeJesus Aff. ¶ 7, Ex. D 5, Ex. E 1.[7]  Between Wednesday, the 31st
of January and Wednesday, the 21st of February, the final day on
which he was assigned to a client site before his termination,
Formilien was assigned exclusively to JFK, working on seventeen
days.  See First DeJesus Aff. Ex. D 5.

When Formilien was informed by DeJesus that he would be
assigned to JFK on a more regular basis, he complained to her
about the assignment, explaining that it was difficult for him
to travel to the client site.   Id. at ¶¶ 8-9; Second DeJesus
Aff. Ex. A 1-2 (noting Formilien expressed "concerns with being
late to the assignment due to [the] need to take several buses
from his residence").   Notwithstanding DeJesus's reminder that
he was specially trained in October 2006 to accommodate this
variety of circumstances and that the failure of an employee of
a paramilitary organization to follow lawful instructions from a
supervisor could lead to that employee's termination, Formilien
initially refused to report as instructed to JFK.  Def.'s R.
56.1 ¶¶ 11, 16; Second DeJesus Aff. Ex. A 2.  See also Handbook
6, (listing "[i]nsubordination" as among the "grounds for
reprimand, suspension, or dismissal").

At some point thereafter, Formilien spoke with Michael
Matarrese ("Matarrese"), who at all relevant times served as the

---

[7] On the 22nd, 27th, and 28th of January Formilien was assigned to JFK.  See
First DeJesus Aff. Ex. D 5.  On the 24th and 25th of January he was assigned
to the client site of the Morgan Library in Manhattan.  See id.

Operations Vice President at Beau Dietl and who again reminded
Formilien of the purpose for which he was specially trained and
also communicated to Formilien that he would be reassigned once
Beau Dietl arranged for other security officers to receive the
requisite training from Bombardier.  Second DeJesus Aff. Ex. A
1-2; First DeJesus Aff. ¶ 9.   While in the past Beau Dietl
appears to have asserted that Formilien was never threatened
with termination should he refuse to report as instructed to
JFK, Formilien claims that Matarrese did in fact deliver such a
threat.  Second DeJesus Aff. Ex. A 2; Formilien Aff. ¶ 9.   As
his employment record reflects, Formilien ultimately decided to
report as instructed to JFK.

### C. Formilien's Internal Complaint of Discrimination

According    to    Formilien,    apparently    following    these
interactions with DeJesus and Matarrese, he visited the office
of Richard Dietl ("Dietl")--the "Dietl" of Beau Dietl--"[i]n the
last week of January 2007" in order "to complain that he was
being treated unfairly due to his race and national origin."
Pl.'s R. 56.1 ¶ 6.   Though Dietl was not available, Dietl's
assistant recorded in a note Formilien's allegations that
"Matarrese was exhibiting favoritism for Hispanic employees and
forcing Formilien to work at JFK under threat of losing his
job."  Id. at ¶ 7.  Though it is not entirely clear, it appears
that Formilien in this same exchange with Dietl's assistant also

8

complained in particular that "when he was moved from location to location he was in each instance replaced by a[n] . . . Hispanic--in effect that Hispanics were given preferential treatment by receiving the more comfortable [client] sites while Formilien was forced to move around and work nearly exclusively at JFK." Id. at ¶ 8.

According to Beau Dietl, however, Formilien never complained about discrimination "to his supervisors." Def.'s R. 56.1 ¶ 10.  In context, we interpret this assertion as contesting the fact that Formilien ever complained to Dietl's assistant of race and national origin discrimination.[8]

Acknowledging this stark disagreement, Formilien further claims that Dietl's assistant, to whom he had complained, provided the note setting forth his allegations to Matarrese, "who then . . . began to harass [him]." Id. at ¶ 7.  As the only example of this harassment, Formilien asserts that Matarrese approximately two weeks later "forced him to work at JFK for [twenty-seven] hours straight without a break or food."

---

[8] In its answer to the complaint that Formilien brought before the New York City Commission on Human Rights, Beau Dietl denied that Formilien "[i]n the last week of January 2007 . . . reported to [Richard Dietl] that [Michael Matarrese] and [Leibin DeJesus] were subjecting him to disparate treatment because of his race" but admitted that Formilien "may have indicated to Ms. DeJesus that [Formilien] felt he was being discriminated against."  Pl.'s R. 56.1 Ex. 3 ¶ 7, Ex. 4 ¶ 7.  Formilien appears to seize on this statement as evidence for the general proposition that Beau Dietl was aware of his internal complaint.  See Formilien Aff. ¶ 8 (asserting "in the last week of January 2007, I went to the office of . . . Dietl himself to complain that I was being treated unfairly due to my race and national origin" before citing the answer and asserting Beau Dietl "admit[s] that I had complained of discrimination").

Id.  Beau Dietl does not dispute that between Saturday, February 10, 2007 and Sunday, February 11, 2007 Formilien continuously worked for over twenty-seven hours at the client site.  Instead, Beau Dietl admits that on the 10th Formilien was scheduled to work a shift at JFK from noon to midnight, at the conclusion of which Whylly was supposed to assume the guard post at the facilities of Bombardier, which could not be left unmanned.  See First DeJesus Aff. Ex. D 5; Second DeJesus Aff. Ex. A 2, 3.  When Whylly did not arrive at midnight, Formilien waited until between 10:00 a.m. and 12:00 p.m. on the 11th to contact DeJesus.  Upon receiving the telephone call, DeJesus immediately arranged for Faneau to relieve Formilien, which occurred at 3:30 p.m., the earliest relief that was possible under the circumstances.  See Second DeJesus Aff. ¶ 3, Ex. A 2.  In connection with this extended shift, Formilien earned eleven hours of overtime wages on the 11th.  See First DeJesus Aff. Ex. D 5.

After relieving Formilien on the 11th, Faneau himself faced similarly exigent circumstances and was required to remain on guard for over twenty-four hours.  See Second DeJesus Aff. ¶ 3, Ex. A 3.  Relieving Formilien during the midst of what was actually Formilien's scheduled shift on the afternoon and evening of the 11th, Faneau remained on guard through his own scheduled shift from 12:00 a.m. to 8:00 a.m. on the 12th but was

not relieved in the morning as expected by Vernon Coleman, another security officer who had fallen ill. Id. Thus, Faneau was obliged to remain at JFK until 4:00 p.m. when a supervisor of Beau Dietl was finally able to arrive at the client site. See id. In the wake of this chain of events, Beau Dietl recognized the urgency of additional security officers receiving the special training sessions deemed necessary by Bombardier, which were eventually conducted, alleviating the acute demand for qualified employees. See id.

It does not appear that Formilien disputes any of these facts. However, in a prior filing with the New York City Commission on Human Rights, Formilien apparently suggested that Whylly claimed in a later conversation with Formilien that he had informed DeJesus at 10:00 p.m. on the 10th that he would not be able to report for his scheduled shift at JFK. See id. at 3. Apart from the hearsay issue, DeJesus denies that Whylly or for that matter anyone else contacted her or Beau Dietl's weekend service center prior to Formilien on the morning of the 11th. See id. at 2-3.[9]

---

[9] Formilien can only be said to have "apparently" raised this issue because it only surfaces in the record before us in a letter that DeJesus submitted on behalf of Beau Dietl to the New York City Commission on Human Rights ("NYCCHR") and in which she responded to allegations in reply papers that Formilien filed with the NYCCHR. Formilien did not include these reply papers in his submission here. See Second DeJesus Aff. Ex. A 3.

## D. Formilien's Repeated Lateness

Both before and after complaining to Dietl's assistant of being discriminated against on the basis of his race and national origin, Formilien arrived late for scheduled shifts at JFK.  Prior to airing his grievances, on Sunday, January 21, 2007, Formilien was one hour and twenty minutes late for a shift that began at midnight.  See Formilien Aff. Ex. 1 3.  On Monday, January 22, 2007, he was again thirty minutes late for another shift that began at 4:00 p.m. and which may or may not have preceded his complaint.  See id. at 4.[10]  Having lodged his accusations against Matarrese, Formilien was then two hours and forty minutes late on Sunday, February 4, 2007 for a shift that began at noon,[11] thirty minutes late on Wednesday, February 7, 2007 for a shift that began at noon, thirty minutes late on Monday, February 12, 2007 for a shift that began at noon, and

---

[10] Formilien insists that he complained to Beau Dietl's assistant "in the last week of January 2007," which given that January 31, 2007 fell on a Wednesday could plausibly refer to either the week of Sunday, January 21, 2007 or the week of Sunday, January 28, 2007.  Pl.'s R. 56.1 ¶ 6.  This ambiguity introduces some doubt as to whether Formilien's undisputed lateness on January 22, 2007 occurred before or after he brought his complaint.  However, because the shift for which he was late on January 21, 2007 began at midnight, Formilien cannot possibly have complained "in the last of week of January 2007" and also before that shift began.

[11] The Beau Dietl Employee Warning Notice that corresponds to this instance of tardiness incorrectly stated due to a typographical error that Formilien was late for his scheduled shift on February 2, 2007.  See Second DeJesus Aff. ¶ 2, Ex. A 4.  Thus, Formilien correctly disputes that he was late on this date.  See Pl.'s R. 56.1 ¶ 5.  However, this is the only one of the six documented occurrences on which he was late that Formilien contests, a challenge that is rendered rather lame because prior to filing his opposing papers he had already been given notice of (i) the typographical error and (ii) Beau Dietl's assertion that he was two hours and forty minutes late on the 4th (not the 2nd) of February, an assertion that he tellingly does not dispute and that is corroborated by payroll information for this date.  See First DeJesus Aff. Ex. D 5; Second DeJesus Aff. Ex. A 4.

one hour and thirty-seven minutes late on Wednesday, February 21, 2007 for a shift that began at midnight. See id. at 5-8. These six incidents of lateness are all documented in a separate Beau Dietl Employee Warning Notice (a "notice"), each of which DeJesus asserts that she issued to Formilien and that he refused to sign. See id. at 3-8 (listing "Refused" in place of "Signature of Employee"). In the Handbook, Beau Dietl lists among the "grounds for reprimand, suspension, or dismissal" a security officer's "[t]ardiness or failure to report for work without [providing] prior notification" to a supervisor or the office at least four hours ahead of time. Handbook 6, 7.[12] Notwithstanding the fact that lateness is a ground for dismissal, in connection with the first five instances on which Formilien was late, Beau Dietl only issued him a warning. See Formilien Aff. Ex. 1 3-7. After the sixth incident on February 21, 2007, however, Formilien was placed on a probationary period of ninety days. The notice in connection with this incident moreover warned that dismissal would follow "should [the] incident occur again." Id. at 8. While Beau Dietl issued these successive warnings to Formilien, its own policies do not require that a security officer be informed of

---

[12] Elsewhere, the Handbook instructs security officers that "[i]n the event you cannot make your assignment due to a death in the family, sickness, automobile accident or other documented emergency, you have the responsibility to notice the . . . office as soon as humanly possible." Id. at 23. See also id. at 24 ("don't just not show up or arrive late--notify your supervisor!").

any disciplinary action taken against him, whether that action is termination or a lesser reprimand.

Significantly, Formilien does not contest that he was indeed late on these six occasions as set out in each notice. Indeed, we emphasize that the payroll information for each of the dates on which Formilien was late corroborates the amount of his tardiness and reflects the according diminishment in the number of hours for which he was compensated, information that would have certainly registered with Formilien when he received the impacted pay checks. See First DeJesus Aff. Ex. D 5. However, Formilien claims, contrary to the assertion of DeJesus, that during his employment with Beau Dietl he "was never made aware of any 'write-ups' for lateness, tardiness, or absenteeism in violation of any . . . employment policies, written or oral . . . much less asked to sign them." Pl.'s R. 56.1 ¶¶ 2, 4; Formilien Aff. ¶¶ 3, 5. Instead, Formilien claims that he only learned about all of the notices when Beau Dietl attached them to a letter submitted to NYCCHR on May 17, 2007. See Pl.'s R. 56.1 ¶ 3; Formilien Aff. ¶ 4, Ex. 1 1-2. He further alleges that "[i]t was only after I complained of discrimination--at the end of January 2007--that the purported 'write-ups' were drafted." Pl.'s R. 56.1 ¶ 9; Formilien Aff. ¶ 10. However, Formilien does not suggest that he was unaware that the Handbook listed lateness as a ground for dismissal or that he was unaware

that on six occasions he was late and sometimes quite late for the start of his scheduled shift at JFK.

### E. Formilien's Termination

On Thursday February 22, 2007, Arslan Krcic ("Krcic"), who at all relevant times was employed as a field supervisor at Beau Dietl, telephoned Formilien at 10:00 p.m. to "confirm" that Formilien was going to report as instructed for his scheduled shift at JFK, which began at midnight and ended at 8:00 a.m. on the morning of the 23rd.  Formilien Aff. Ex. 1 9.  See also First DeJesus Aff. ¶ 12 (describing the February 23, 2007 notice).  As discussed above, earlier on the 21st, the day before, Formilien had arrived over ninety minutes late for a shift at JFK that similarly began at midnight.  See Formilien Aff. Ex. 1 8.  According to the notice prepared in connection with this further incident on the telephone, Formilien responded to Krcic, who was his immediate supervisor, that "he did not feel like going to work for his scheduled [shift]."  Id.  On Monday, February 26, 2007, Beau Dietl terminated Formilien because, as it stated in a notice of separation completed on the same date, he "refused to go in for his scheduled [shift]" and "ha[d] also been late [six] or more time[s] within [two] months."  Formilient Aff. Ex. 1 10.

Formilien does not dispute that Krcic telephoned him at 10:00 p.m. on the 22nd.  Formilien Aff. ¶ 11.  However,

Formilien claims that he was scheduled to begin a shift at JFK at 8:00 a.m. on the 23rd, not midnight, and that Krcic called him to request that he additionally cover the earlier shift from 12:00 a.m. to 8:00 a.m. for another security officer. Id. Because "[his] children were very young and he had no way to find a babysitter at that late hour and on that short notice," Formilien claims that he refused to report as instructed to JFK. Id. Having refused the assignment, Formilien alleges that he was told by Krcic not to appear for his scheduled shift at 8:00 a.m. Id. As with all of the previous notices which similarly indicate on their face that Formilien was presented with them but refused to sign them, Formilien claims that he did not see the notice of separation until well after his termination. See Pl.'s R. 56.1 ¶¶ 2, 4; Formilien Aff. ¶¶ 3, 5. Curiously, Formilien also claims with regard to the notice of separation that because an illegible signature of the employee of Beau Dietl who reviewed it appears to have been written on the 20th and not the 26th that "[c]learly, [Beau Dietl] had already made a decision to fire [him] before the 'last incident' on February 22-23, 2007." Formilien Aff. ¶ 12. In response to this allegation, DeJesus asserts that "[w]hen the form was reproduced the dates did not come out legibly," explaining "the tail on the number six was shortened next to one signature," which nonetheless still plainly indicates that the notice was

16

signed on the 26th, "and disappears on the date next to the second signature making the six look like a zero."  Second DeJesus Aff. ¶ 4.  <u>See</u> Formilien Aff. Ex. 1 10 (notice of separation).  While Formilien does not address this explanation provided together with Beau Dietl's reply papers, he also does not address how on the 20th Beau Dietl could have anticipated that Formilien would be late for the sixth time on the 21st.

### F. Formilien's Pending Action

On April 12, 2010, Formilien brought this pending action, asserting claims of race and national origin discrimination as well retaliation and hostile work environment under Title VII, § 1981, and also state and municipal laws.  <u>See, e.g.</u>, Compl. ¶¶ 39-45 (Title VII discrimination and hostile work environment claims), 46-48 (Title VII retaliation), 49-55 (§ 1981 discrimination and hostile work environment), 56-58 (§ 1981 retaliation).

### III. Discussion

### A. Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted). "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (citing Anderson, 477 U.S. at 249). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a

discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" Gorzynski, 596 F.3d at 101 (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Holcomb, 521 F.3d at 137 (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)). With that said, it is well established that "summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

## B. Discrimination on the Basis of Race and National Origin Under Title VII and § 1981

It is well-established that discrimination claims brought under Title VII and § 1981 are analyzed under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491–92 (2d Cir. 2010). First, the employee bears the burden of producing evidence to support a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802. To establish a prima facie case of race and national origin discrimination under Title VII and race discrimination under

§ 1981, the employee must "show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." <u>Ruiz</u>, 609 F.3d at 492.[13] "Although the burden of proof in establishing a prima facie case is 'minimal,' it is not non-existent." <u>Dumay v. City of New York</u>, No. 09 Civ. 6866 (NRB), 2011 WL 4901311, at *7 (S.D.N.Y. Oct. 14, 2011) (quoting <u>Roge v. NYP Holdings, Inc.</u>, 257 F.3d 164, 168 (2d Cir. 2001)).

Second, if the employee establishes a <u>prima facie</u> case, then the evidentiary burden shifts to "the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. <u>McDonnell Douglas</u>, 411 U.S. at 802. In particular, the employer "'must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, <u>if believed by the trier of fact</u>, would support a finding that unlawful discrimination was not the cause of the employment action.'" <u>Hongyan Lu v. Chase Inv. Servs. Corp.</u>, 412 F. App'x 413, 415 (2d Cir. 2011) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993) (emphasis in original)).

---

[13] While Formilien asserts claims of both race and national origin discrimination under § 1981, the statute only "encompasses discrimination based on ancestry or ethnic characteristics," not national origin. <u>Anderson v. Conboy</u>, 156 F.3d 167, 170 (2d Cir. 1998). Accordingly, we grant summary judgment to Beau Dietl on those claims brought under § 1981 to the extent that they are premised on the fact that Formilien is from Haiti.

Third, if the employer articulates a nondiscriminatory reason for the adverse employment action, then the employee, with whom "'[t]he ultimate burden of persuading the trier of fact . . . remains at all times,'" must "demonstrate by competent evidence that 'the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.'" Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)). To create a dispute as to a material issue of fact and so defeat a motion for summary judgment, however, an employee is required to come forward with "'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the [adverse employment action]." Hongyan, 412 F. App'x at 416 (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)). "In determining whether the articulated reason for the action is a pretext, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action.'" Hartley v. Rubio, 785 F. Supp. 2d 165, 177 (S.D.N.Y. 2011) (quoting

<u>DeMarco v. Holy Cross High Sch.</u>, 4 F.3d 166, 170-71 (2d Cir. 1993)).

In moving for summary judgment on the discrimination claims, Beau Dietl argues that Formilien fails to establish a <u>prima facie</u> case of race and national-origin discrimination and that furthermore Formilien also fails to demonstrate that its nondiscriminatory reasons for the actions that it took against him are pretextual.

## 1. <u>Prima Facie</u> Case

There is no dispute that Formilien, a black male whose nation of origin is Haiti, is a member of protected classes and that he was qualified to serve as a security officer at Beau Dietl.  There is also no dispute that Formilien's termination is an adverse employment action.  In its moving and reply papers, however, Beau Dietl specifically contests that his reassignment to JFK constitutes an adverse employment action and further asserts that regardless of whether it does Formilien fails to come forward with evidence from which to infer that any adverse employment action taken against him reflected a discriminatory animus.  With these arguments in mind, we broadly address the third and fourth elements of the <u>prima facie</u> claim in turn.

### a. Adverse Employment Action

In the context of discrimination claims, the set of employment actions that the Second Circuit has "deemed

sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (ellipsis in original) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "[T]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (internal quotation marks omitted). In the absence of comprehensive "'bright-line rules,'" whether a particular employment action is properly characterized as "adverse" requires careful assessment of the context in which it was made. Greaves v. St. Luke's / Roosevelt Hosp. Ctr., No. 03 Civ. 7424 (SAS), 2005 WL 627635, at *4 (S.D.N.Y. Mar. 17, 2005) (quoting Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997)).

It is not actually clear from the submissions of either of the parties which of the actions that Beau Dietl took with regard to Formilien are alleged to be adverse employment actions. A review of the record indentifies five possibilities: (1) the repeated reassignment from "more comfortable" client sites at which Formilien was replaced by other security officers

23

who were Hispanic (the "Repeated Reassignments"); (2) the reassignment to JFK, in particular (the "JFK Reassignment"); (3) the assignment to a shift that ran for over twenty-seven hours (the "27.5-Hour Shift"); (4) the notices for lateness (the "Lateness Notices"); and (5) the termination (the "Termination"). Assuming the sufficiency of (5), we consider below (1) and (2) together and (3) and (4) separately.

### i. The Repeated Reassignments and the JFK Reassignment

As to the Repeated Reassignments and the JFK Reassignment, a transfer can amount to an adverse employment action "'if it results in a change in responsibilities so significant as to constitute a setback to the [employee]'s career [or] involve[s] a demotion in form or substance [or] cause[s] materially significant disadvantage.'" Greaves, 2005 WL 627635, at *5 (initial set of brackets added) (quoting Galabya, 202 F.3d at 641). However, with regard to "a transfer [that] is truly lateral and involves no significant changes in an employee's conditions of employment," the Second Circuit has observed that "the fact that the employee views the transfer either positively or negatively does not of itself render . . . the transfer an adverse employment action." Williams, 368 F.3d at 128 (internal quotation marks omitted). Where the only material impact of an employee's lateral transfer is a longer commute, courts have found in the context of discrimination claims that this

consequence of the transfer is properly characterized as a mere inconvenience, insufficient to amount to an adverse employment action.  See, e.g., Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (where an "[employee] retained the same position, the same responsibilities, and the same salary and benefits" and "[t]he only substantive difference between the two positions was that the [new] position resulted in a longer commute" the employee suffered "an inconvenience, not an adverse employment action").  Even where the inconvenient location of the new workplace combines with less favorable hours of employment, a transfer may not amount to an adverse employment action.  See Johnson v. Eastchester Union Free Sch. Dist., 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002) (considering such a transfer in the parallel context of an age-discrimination claim).  See also Antonmarchi v. Consolidated Edison Co. of N. Y., Inc., No. 03 Civ. 7735 (LTS), 2008 WL 4444609, at *15 (S.D.N.Y. Sept. 29, 2008) (observing "an inconvenience, such as an increased commute or unfavorable hours, does not constitute an adverse employment action" pursuant to the broader definition of that term applicable to retaliation claims).

Having set out the established approach to analyzing "transfers" in the context of employment-discrimination cases, we pause to question whether it is proper to consider Formilien's movement between client sites as "transfers" in the

ordinary sense in which that term is used.  On this issue, the
context of Beau Dietl's business model is significant.  As
DeJesus explained and contemporaneous payroll records confirmed,
Beau Dietl regularly moves its security officers between
assignments, many of which are temporary in nature, pursuant to
the requirements of its clients.  Thus, while it is typical for
many employees in many industries to report for years to a
single location at which they regularly work, security officers
at Beau Dietl, both blacks and Hispanics, are accustomed to move
between client sites with frequency.  As his employment history
demonstrates, Formilien is no exception.  Because of this
dynamic, we think that to the extent that the nature of his work
and the location of his workplace varied between client sites,
these variations are properly viewed in the aggregate as
reflecting the overall conditions and terms of his employment.
See Ofori-Awuku v. Epic Sec., No. 00 Civ. 1548 (AGS), 2001 WL
180054, at *4 (S.D.N.Y. Feb. 23, 2001) (finding no adverse
employment action based on security guard's removal from a
particular client site and emphasizing "[[i]t is far from clear
that such action was a change to the terms and conditions of
plaintiff's employment, because [defendant's] security guards
are temporarily assigned to various businesses, and may be
removed from a particular location as a matter of policy
regardless of cause" before noting "[e]ven if plaintiff's

removal were a change, it certainly was not materially adverse, given the temporary nature of his posting and the established transiency of a guard's presence at particular sites"). Though it may appear an exercise in semantics, we therefore refer to the Repeated Reassignments and the JFK Reassignment as reassignments and not transfers and analyze their "adversity" with the fluidity of Beau Dietl's workplace squarely in mind.

Turning to the Repeated Reassignments, Formilien has not even identified the successive client sites from which he was repeatedly reassigned.[14]  Furthermore, the only difference that Formilien asserts between the client sites at which he worked is that those client sites from which he was transferred were "more comfortable."  Formilien Aff. ¶ 10.  This conclusory allegation on which Formilien in no manner elaborates suggests on its face nothing more than an issue of comparative convenience, which is insufficient to support an adverse employment action.

Turning to the JFK Reassignment, according to Beau Dietl, Formilien complained to DeJesus regarding the commute and hours of employment that his reassignment to JFK entailed.

On the commute, Beau Dietl's evidentiary submissions relate that Formilien conveyed to DeJesus that the commute from his home to JFK was difficult, requiring the use of four buses.  See

---

[14] In light of the fact that Formilien was often assigned to different client sites within a given month and for that matter week, we cannot even hazard a guess at which reassignments Formilien might reference.  See First DeJesus Aff. Ex. D 1-5.

First DeJesus Aff. ¶¶ 8-9; Second DeJesus Aff. Ex. A 1-2.   There
is no information, however, on how this commute to Queens
actually compared to any of his prior commutes to the various
client sites to which he was previously assigned in Manhattan.
In the absence of such information, we find that Formilien fails
to establish that the increased difficulty of his commute, if
any, rose above the level of an inconvenience.[15]

On the hours of employment, it appears that in November and
December, the months preceding his more regular assignment to
JFK, Formilien was usually assigned to the Morgan Library's
client site in Manhattan where he often worked a shift from
10:30 a.m. to 5:30 p.m.  See First DeJesus Aff. Ex. D 3-4.   At
JFK, Formilien not infrequently worked a shift that began or
ended at midnight.  See id. at 4-5.  However, during the months
of April through September when Formilien worked predominantly
at client sites of Conde Nast Publications in Manhattan, he
typically worked a shift from 7:00 p.m. or 11:00 p.m. to 7:00
a.m.  See id. at 1-3.  Therefore, when viewed in the proper
context, the immediate change in shift that occurred when
Formilien was reassigned to JFK actually reflects the reality of
the terms and conditions of his employment for the bulk of his

---

[15] Moreover, the reassignment to JFK in all respects but in particular with
regard to the commute must also be viewed in recognition of the fact that it
is undisputed that Formilien willingly and knowingly participated in the
special training session that took place at JFK and so previously volunteered
for his possible reassignment there.   See Def.'s R. 56.1 ¶¶ 4-5; Second
DeJesus Aff. Ex. A 1.

tenure as a security officer at Beau Dietl. Furthermore, the Second Circuit has stated that absent "extraordinary circumstances" a change in an employee's shift is not a per se adverse employment action. DiBrino v. Dep't of Veteran's Affairs, 118 F. App'x 533, 534 (2d Cir. 2004). Formilien has not raised any extraordinary circumstances here. In addition, it is not disputed that Matarrese assured Formilien that he would be reassigned from JFK once other security officers were qualified to work at the client site. See Leget v. Henderson, Nos. 99 Civ. 3636 (DLC) and 99 Civ. 4610 (DLC), 2001 WL 43615, at *6 (S.D.N.Y. Jan. 18, 2001) (where employee's "temporary transfer" for three weeks did not impact her salary, benefits, or title there was no adverse employment action).

In light of the foregoing analysis and the crucial fact that Formilien does not claim that his compensation, benefits, or substantive work as a security officer were altered or his career prospects with Beau Dietl were dimmed as a result of his reassignments (i.e. they were not de facto demotions), we find that the Repeated Reassignments and the JFK Reassignment in particular do not constitute adverse employment actions. Indeed, any other holding would impermissibly involve the Court in micro-managing the business of Beau Dietl.

### ii. The 27.5-Hour Shift

While we do not question that the over twenty-seven hours that Formilien remained on guard at JFK were unpleasant, this unexpectedly long shift does not constitute an adverse employment action in the context of a discrimination claim. The event had absolutely no impact on the terms or conditions of his employment, and he received considerable overtime compensation for it. Viewed in the light most favorable to Formilien, this episode reflects no more than an unwanted but one-time prolonging of the hours of his employment by Beau Dietl due to unforeseen circumstances. See Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 618 (S.D.N.Y. 2009) ("a one-time-only request that [p]laintiff complete a work assignment that would normally require two and a half hours to complete only fifteen minutes before he was due to leave for the day" was not an adverse employment action); Reckard v. Cnty. of Westchester, 351 F. Supp. 2d 157, 161 (S.D.N.Y. 2004) (where corrections officer was ordered "to work a single over time shift" notwithstanding a health condition the extended shift could not "reasonably be construed as a materially adverse change in her overall working conditions" especially where she "never alleged that working this shift had any detrimental impact on her health" and it was "undisputed that [she] was given overtime pay for the hours she worked").

30

### iii. The Lateness Notices

Formilien does not dispute that he was late on six occasions and that even one lateness may provide a legitimate ground for dismissal. As the Second Circuit has made clear, "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006). See also Chang v. Safe Horizons, 254 F. App'x 838, 839 (2d Cir. 2007) ("oral and written warnings do not amount to materially adverse conduct").

Instead, Formilien focuses on the contention that he was not presented with any of the notices generated because of his lateness, the last of which informed him that he had been placed on probation for ninety days and that dismissal would follow a further incident. However, this contention only raises a dispute as to an immaterial fact because under its own policies Beau Dietl was not under any obligation to provide Formilien with any notices in connection with its decision to terminate him, let alone impose a lesser disciplinary action such as probation. See Handbook 6, 7.

### b. Inference of Discrimination

While we find that the Repeated Reassignments, the JFK Reassignment, the 27.5-Hour Shift, and the Lateness Notices all

31

fail to support a prima facie claim because they are not adverse employment actions, we also find that these actions together with the Termination prove insufficient because Formilien fails to establish an inference of discrimination in connection with any of them.  With one exception, the record is devoid of facts that would logically support the inference that Formilien was being discriminated against because of his race and national origin.  The exception, which facially relates only to the Repeated Reassignments and the JFK Reassignment, is the conclusory allegation that Formilien was repeatedly reassigned away from more comfortable client sites and replaced by other security officers who were Hispanic, an allegation of disparate treatment.

    "A showing of disparate treatment--that is, a showing that an employer treated [an employee] 'less favorably than a similarly situated employee outside his protected group'--is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case."  Ruiz, 609 F.3d at 493 (quoting Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)).  "A plaintiff relying on disparate treatment evidence 'must show []he was similarly situated in all material respects to the individuals with whom []he seeks to compare h[im]self.'"  Mandell, 316 F.3d at 379 (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).  Here, Formilien

has not identified the "more comfortable" client sites from which he was reassigned and has similarly not identified the Hispanic security officers who allegedly replaced him. Furthermore, there is literally no information in the record that would permit us to compare Formilien with his purported replacements, let alone allow us to determine whether any of them were similarly situated to him in all material respects. In the absence of any such evidence, an inference of discrimination simply cannot be drawn.   See Gibson v. Wyeth Pharm., Inc., No. 07 Civ. 946 (LTS), 2011 WL 830671 (S.D.N.Y. Mar. 9, 2011) (finding there was no inference of race discrimination based on disparate treatment where employee failed to provide sufficient evidence from which to conclude that an employee's coworkers were similarly situated).[16]

Thus, Formilien cannot establish a prima facie case because he fails to assert an adverse employment action and/or articulate a basis from which to reasonably infer a discriminatory animus on the part of his employer in connection with any of its actions.   Accordingly, we grant Beau Dietl's

---

[16] Because it is Formilien's burden to demonstrate that he was similarly situated to the other security officers, Beau Dietl need not come forward with evidence of how their circumstances differed.   However, one possible difference that leaps from the record with regard to the JFK Reassignment is that possibly unlike his replacement in that instance, Formilien had attended the special training session that is a prerequisite to working at the client site of Bombardier.

motion for summary judgment as to the claims of race and national-origin discrimination.[17]

### C. Hostile Work Environment Under Title VII and § 1981

"In order to survive summary judgment on a claim of hostile work environment harassment, a[n employee] must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted) (analyzing hostile work environment claims brought under inter alia Title VII and § 1981). In the absence of any facts whatsoever in the record from which to infer a discriminatory animus, Formilien's claims of hostile work environment fail on their face, and we grant Beau Dietl's motion for summary judgment as to these claims as well.

---

[17] Though we need not reach the issue, we also find that Beau Dietl has articulated nondiscriminatory reasons for its actions, which Formilien has failed to successfully assail as pretext. We explore those reasons for the 27.5-Hour Shift, the Lateness Notices, and the Termination in connection with Formilien's retaliation claims in Part III.D.2 below. As for the Repeated Reassignments, we find that Beau Dietl's general representation that its security officers are regularly reassigned in response to client demands and to cover for those of their colleagues who are on vacation or otherwise absent is a sufficient explanation in light of the lack of particularity with which Formilien conclusorily alleges that he was repeatedly reassigned. As for the JFK Reassignment, we find that Beau Dietl's explanation that given the special-training-session requirement to serve at Bombardier's client site that Formilien's possession of this qualification explains why he was reassigned to cover for colleagues who were assigned to JFK and were on vacation or were terminated. In response to these nondiscriminatory reasons, Formilien brings forward no evidence whatsoever of pretext.

## D. Retaliation Under Title VII and § 1981

While Formilien's claims that he was discriminated against on the basis of his race and national origin are dismissed, it is well established that "[a] finding of unlawful retaliation is not dependent on the merits of [such] underlying discrimination [claims]." Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986). Thus we proceed to analyze Formilien's retaliation claims under Title VII and § 1981 pursuant to the same three-step burden-shifting framework that also governs discrimination claims under these statutes:

> First, the plaintiff must establish a prima facie case of retaliation. If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory. If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action.

Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (citing Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)).

### 1. Prima Facie Case

"[T]o establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the [employer]; [2] an employment action disadvantaging the [employee]; and [3] a causal connection between the protected activity and the adverse employment action."

35

Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d
114, 123 (2d Cir. 2008).  As to the first of these requirements,
there is no dispute that in complaining to Dietl's assistant
about discrimination on the basis of his race and national
origin Formilien engaged in a protected activity under Title VII
and § 1981.[18]  As to the third of these requirements, at most one
month elapsed between the internal complaint and all of the
actions on which Formilien might conceivably found his claims of
retaliation.  Under these circumstances, the temporal proximity
of these events alone can support the requisite showing of a
causal connection.  See Treglia v. Town of Manlius, 313 F.3d
713, 721 (2d Cir. 2002) (one month lapse between protected
activity and allegedly adverse employment action sufficient to
make out required causal link).

     As to the second of these requirements, it is now well
established that "'the anti-retaliation provision of [Title
VII], unlike [Title VII's] substantive provision, is not limited
to discriminatory actions that affect the terms and conditions
of employment.'"  Kessler v. Westchester Cnty. Dep't of Soc.

---

[18] In his opposing papers, Formilien only directly references his internal
complaint to Dietl's assistant as a basis for his retaliation claims.  See
Pl.'s R. 56.1 ¶¶ 6-7; Formilien Aff. ¶ 8-9.  With that said, he appears to
buttress his claim that Beau Dietl was aware of his internal complaint (and
cannot now dispute its occurrence) by citing to a filing from the prior
proceedings before the NYCCHR in which Beau Dietl acknowledged that Formilien
may have informed DeJesus that he felt he was the victim of discriminatory
treatment.  See supra note 8.  Given Formilien's failure to affirmatively
assert that he actually complained to DeJesus, we will not treat this as a
separate complaint.  However, we note that our findings would not change if
we did.

Servs., 461 F.3d 199, 207 (2d Cir. 2006) (emphasis in original) (quoting Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006)).  "Rather, to prevail on a claim for retaliation under Title VII, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Kessler, 461. F.3d at 207 (quoting White, 548 U.S. at 68).  "Thus, the standard that the plaintiff must meet is lower for a retaliation claim than for a disparate treatment claim."  Flynn v. N.Y. State Div. of Parole, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009).  With that said, "'[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience' because such actions have no legally cognizable deterrent effect."  Id. (quoting White, 548 U.S. at 68).[19]

Again, neither of the parties has identified the allegedly adverse employment actions that underlie the retaliation claims in this case.  Referring back to the list of possible adverse employment actions that we previously identified, however, the

---

[19] We note that while the lower threshold for what constitutes an adverse employment action in the context of retaliation claims under Title VII is rooted in the statutory text of Title VII, it appears that the Second Circuit has found that this lower threshold also applies to retaliation claims under § 1981.  See Fincher, 604 F.3d at 721 (quoting White's articulation of the lower threshold in analyzing retaliation claim advanced under § 1981 alone).

27.5-Hour Shift, the Lateness Notices, and the Termination all occur after the internal complaint was brought and so we will analyze them here.

We previously found the 27.5-Hour Shift and the Lateness Notices did not constitute adverse employment actions in the discrimination context. In light of the lower threshold applicable in the retaliation context, we do not disagree with Formilien that a reasonable employee could be dissuaded from making or supporting a charge of discrimination if faced with the unexpected obligation to work continuously for over twenty-seven hours as retaliation. However, we do not think that the analytical shift from discrimination to retaliation alters whether the Lateness Notices are adverse employment actions because among the precedent upon which we previously drew is a case that addresses the adversity issue in the retaliation context post-White and Kessler and that "note[s] that oral and written warnings do not amount to materially adverse conduct." Chang, 254 F. App'x at 839. A complaint simply cannot inoculate an employee from discipline for admitted violations of basic obligations.

### 2. Non-Retaliatory Reasons

Beau Dietl has provided non-retaliatory reasons for its treatment of Formilien following his internal complaint of discrimination on the basis of his race and national origin.

38

As to the 27.5-Hour Shift, DeJesus has asserted that it only occurred because Whylly failed to report as scheduled to JFK on midnight on February 11, 2007 and Formilien failed to earlier report that Whylly had not reported and that he remained on guard. Once Formilien, contacted DeJesus himself, it is not disputed that she immediately arranged for Faneau to relieve him as soon as possible. In turn, Faneau himself was obliged to remain on guard for over twenty-four hours when the security officer who was supposed to replace him fell ill. As DeJesus acknowledges, the overall episode, which took place over forty-eight hours, impressed on Beau Dietl the urgency of the need to qualify additional security officers for service at JFK.

As to the Termination, the reasons therefore are objective and documented. The warning and separation notice that Beau Dietl prepared in connection with this incident convey that Formilien "refused to go in for his scheduled [shift]" on February 23, 2007 when asked by Krcic and had "also been late [six] or more time[s] within [two] months." Formilien Aff. Ex. 1 9-10. As the Handbook makes clear, both insubordination and lateness are independent grounds for the dismissal of a security officer, and in this case, Formilien had in the immediately preceding weeks both initially disobeyed instructions from DeJesus to report to JFK and arrived late for

his scheduled shifts at JFK on multiple occasions, in a few cases well over an hour late.

### 3. Pretext

In light of these non-retaliatory reasons, we thus consider whether Formilien has produced evidence from which a rational juror could find that retaliation was a substantial reason for the 27.5-Hour Shift and the Termination.  As the Second Circuit has recently clarified, "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the employee]'s burden to bring forward some evidence of pretext."  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam).  See Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 457 (E.D.N.Y. 2011) (applying El Sayed to retaliation claims under inter alia Title VII and § 1981).

Formilien does not expressly raise a basis for finding that the proffered non-retaliatory reasons are pretextual. Nonetheless, we find three arguments in the record that bear on this issue.  First, it appears that Formilien has previously alleged that Whylly informed DeJesus late in the evening on February 10, 2007 that he would not arrive to relieve Formilien at midnight, a claim that DeJesus vigorously denies.  See Second

DeJesus Aff. Ex. A 2-3.   However, Formilien's allegation that DeJesus was forewarned he would not be relieved is premised on the inadmissible hearsay of Whylly's statement to Formilien and so cannot create a dispute as to a material fact sufficient to sustain an argument of pretext.

Second, Formilien appears to argue that it was unreasonable for Krcic to request at 10:00 p.m. on February 22, 2007 that he appear for an unscheduled shift at JFK at midnight and that because his refusal to do so provided the basis for Beau Dietl's decision to terminate him that a pretextual inference should be inferred from the unreasonableness of the circumstances.   This inference necessarily relies on Formilien's and not Beau Dietl's account of this incident, which we must credit at this stage of the proceedings.   However, Formilien has not offered any reason for a rational juror to think that Krcic, against whom Formilien did not complain, would have been motivated by a retaliatory animus--indeed Formilien does not even suggest that Krcic was aware, like Matarrese, of the fact that he had complained of discrimination.   See Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (finding "no rational juror" could conclude that alleged assault against prisoner by a corrections officer was in retaliation for a prior complaint that did not name the corrections officer or involve an incident in which he supposedly participated).   While Krcic's alleged demand might

41

appear unreasonable, without more its possible unreasonableness does not undermine Beau Dietl's non-retaliatory rationale for Formilien's termination, particularly in light of his repeated lateness. See Alston v. N.Y. City Transit Auth., 14 F. Supp. 2d 308, 313-14 (S.D.N.Y. 1998) (awarding employer judgment notwithstanding a jury verdict where employee failed to demonstrate as a matter of law that its proffered reasons for its actions "were pretexts for retaliation" and emphasizing "'a fact-finder need not, and indeed should not evaluate whether a defendant's stated purpose is unwise or unreasonable'") (quoting DeMarco v. Holy Cross High Sch., 4 F.3d 166, 170-71 (2d Cir. 1993)).

Third, Formilien asserts that because the date beside the illegible signature of the employee of Beau Dietl who reviewed his notice of separation appears to have been written on February 20, 2007 and not February 26, 2007, the date of his termination, that "[c]learly, [Beau Dietl] had already made a decision to fire [him] before the 'last incident' on February 22-23, 2007," which Beau Dietl manufactured as a pretext. Formilien Aff. ¶ 12. As an initial matter, Beau Dietl has provided a plausible explanation based on the reproduction of the document that accounts for why it appears that the date of the reviewer's signature is the 20th and not the 26th. See Second DeJesus Aff. ¶ 4; Formilien Aff. Ex. 1 10. Furthermore,

Formilien ignores that DeJesus's signature is dated the 26th on the same notice of separation, which moreover refers to six occasions on which Formilien was late, the sixth of which only occurred on the 21st.  In light of Beau Dietl's explanation and these facts, Formilien must be understood to argue that an unidentified employee of Beau Dietl, seeking to exact revenge against Formilien for bringing his internal complaint, signed a blank form, which was completed six days later.  A rational juror could not reasonably embrace such a speculative theory.

Accordingly, we find that Formilien fails to raise a genuine issue of material fact sufficient to challenge the non-retaliatory reasons that Beau Dietl provides for its actions and that the motion for summary judgment as to his retaliation claims is granted.

### E. Remaining State and Municipal Law Claims

Having granted summary judgment and dismissed all of the claims for which there exists federal-question jurisdiction, we find that diversity jurisdiction is lacking over the remaining state and municipal law claims.  It is well established that diversity of citizenship must be positively alleged.  See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 47 (2d Cir. 1996).  In his complaint, Formilien asserts that diversity jurisdiction exists in this case.  See Compl. ¶¶ 6, 7.  In support of this assertion, Formilien states that he

is "a resident of Brooklyn" and that Beau Dietl "is a corporation or other business entity authorized to do business in or otherwise operat[e] in New York pursuant to the laws of the State of New York, with its principal place of business [in] . . . New York." Id. at ¶¶ 3, 4. If Beau Dietl is an incorporated business entity, then regardless of where it is incorporated, it is also a citizen of New York, like Formilien, because its principal place of business is allegedly located here. See 28 U.S.C. § 1332(c)(1). If Beau Dietl is an unincorporated business entity, then it is well established that its citizenship is that of all of its members, and Formilien has failed to identify these members let alone assert their citizenship for diversity purposes. See generally Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990). Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). See also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988) ("in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims"). We exercise this

discretion here and decline supplemental jurisdiction over Formilien's state and municipal law claims.

### IV. Conclusion

For the reasons stated above, Beau Dietl's motion for summary judgment is granted as to the federal law claims, and we exercise our discretion to dismiss the remaining state and municipal law claims.


Dated:      New York, New York
            June 21, 2012

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on
this date to the following:

Attorney for Plaintiff:
Michael L. Ferch, Esq.
280 Madison Avenue, Suite 912
New York, NY 10016

Attorney for Defendant:
John Q. Kelly, Esq.
Ivey, Barnum & O'Mara, LLC
170 Mason Street
Greenwich, CT 06830